1  WILMER CUTLER PICKERING HALE & DORR LLP
   Robert M. Galvin (SBN: 171508)
2  robert.galvin@wilmerhale.com
   Anh-Khoa Tran (SBN: 295393)
3  khoa.tran@wilmerhale.com
   950 Page Mill Road
4  Palo Alto, CA 94304
   Telephone: (650) 858-6000
5  Fax: (650) 858-6100

6  Robert J. Gunther, Jr. (NY SBN: 1967652)
   robert.gunther@wilmerhale.com
7  Christopher R. Noyes (*pro hac vice*)
   christopher.noyes@wilmerhale.com
8  7 World Trade Center
   250 Greenwich Street
9  New York, NY 10007
   Telephone: (212) 230-8800
10 Fax: (212) 230-8888

11 Attorneys for Plaintiffs
   COGENRA SOLAR, INC. and
12 KHOSLA VENTURES III, L.P.

13                  UNITED STATES DISTRICT COURT
14                 NORTHERN DISTRICT OF CALIFORNIA
                        SAN FRANCISCO DIVISION
15

16 COGENRA SOLAR, INC., a Delaware
    corporation,
17
                                              Case No. 3:16-cv-05481-VC
    and
18
   KHOSLA VENTURES III, L.P., a Delaware
19 limited partnership,

20                  Plaintiffs,
                                              SECOND AMENDED COMPLAINT FOR
21          v.                                MISAPPROPRIATION OF TRADE
                                              SECRETS, INTENTIONAL
22 SOLARCITY CORPORATION, a Delaware          INTERFERENCE WITH PROSPECTIVE
    corporation,                              ECONOMIC ADVANTAGE, PROMISSORY
23                                            ESTOPPEL, BREACH OF CONTRACT,
    and                                       AND UNFAIR BUSINESS PRACTICES
24
   SILEVO, INC., a Delaware corporation,
25                                            DEMAND FOR JURY TRIAL
                    Defendants.
26

27

28

Plaintiffs Cogenra Solar, Inc. ("Cogenra") and Khosla Ventures III, L.P. ("Khosla Ventures") complain and allege as follows against Defendants SolarCity Corporation ("SolarCity") and Silevo, Inc. (f/k/a Sierra Solar Power, Inc.) ("Silevo").

## THE PARTIES

1.     Plaintiff Cogenra is a Delaware corporation having a principal place of business at 77 Rio Robles, San Jose, California 95134.  Cogenra designs and manufactures proprietary solar panel technologies that achieve levels of performance and efficiency that are among the highest in the solar industry.  Cogenra is a wholly-owned subsidiary of SunPower Corporation, which is based in San Jose, California.

2.     Plaintiff Khosla Ventures is a Delaware limited partnership having a principal place of business at 2128 Sand Hill Road, Menlo Park, California 94025.  Khosla Ventures provides venture assistance and strategic advice to entrepreneurs working on breakthrough technologies.  The firm was founded in 2004 by Vinod Khosla, co-founder of Sun Microsystems.  With over four billion dollars under management, the firm focuses on making investments in a broad range of areas, including education, health, agriculture/food, sustainable energy, and robotics.

3.     Defendant SolarCity is a Delaware corporation having a principal place of business at 3055 Clearview Way, San Mateo, California 94402.  SolarCity maintains numerous offices in the United States and is doing business in this judicial district.  SolarCity designs, finances, and installs solar power systems on residential, government, and commercial buildings.

4.     Defendant Silevo is a Delaware corporation having a principal place of business at 47700 Kato Road, Fremont, California 94538.  Silevo is a wholly-owned subsidiary of SolarCity and is doing business in this judicial district.  Silevo is a solar component manufacturer.

## JURISDICTION

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, 2201, 2202, and the trade secret laws of the United States, 18 U.S.C. §§ 1836 and 1839.  This Court also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts.

6. This Court has personal jurisdiction over SolarCity because SolarCity has its principal place of business in this judicial district, regularly does business in this judicial district, and has misappropriated trade secrets in California and in this district. Upon information and belief, SolarCity derives significant benefits from its misappropriation of trade secrets, intentional interference with Cogenra's economic advantage, intentional misrepresentation, engagement in fraudulent business practices, and breach of contract within this district, and knows its actions will have consequences within this district.

7. This Court has personal jurisdiction over Silevo, which is owned by SolarCity, because Silevo has its principal place of business in this judicial district, regularly does business in this judicial district, and has misappropriated trade secrets in California and in this district. Upon information and belief, Silevo derives significant benefits from its misappropriation of trade secrets, intentional misrepresentation, and breach of contract within this district, and knows its actions will have consequences within this district.

## VENUE

8. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) because SolarCity and Silevo have their principal places of business in this district, transact business in this district, have misappropriated trade secrets in this district, and are subject to personal jurisdiction in this district. In addition, venue is proper because Cogenra and Khosla Ventures have their principal places of business in this district, and have suffered harm in this district.

## INTRADISTRICT ASSIGNMENT

9. Pursuant to Civil Local Rule 3-5(b), intradistrict assignment in San Francisco is proper because the unlawful conduct that gives rise to these claims substantially occurred in the County of San Mateo.

## BACKGROUND

10. Cogenra is a solar innovation company, founded in 2009 with the goal of reducing the world's reliance on fossil fuels by producing low cost, high performance, and highly reliable solar modules. Cogenra's proprietary technologies have been field-proven in over forty installations worldwide, including a one megawatt solar array at the University of Arizona's Solar Zone.

11.     From 2009 to 2015, Khosla Ventures was the majority shareholder of Cogenra, owning approximately 80% of the company.  During this time period, Khosla Ventures invested over $40 million to enable Cogenra to develop and bring to market its innovative solar cell technology, including by making multiple bridge loans for millions of dollars while pursuing acquisition offers for Cogenra.  Khosla Ventures held a seat on Cogenra's Board of Directors and provided support and assistance with Cogenra's management, operations, and sales.

12.     Between 2010 and 2014, Cogenra shared its most precious and confidential trade secrets, manufacturing processes, and other intellectual property with Silevo and SolarCity: Cogenra's innovative "shingling" technology for manufacturing high-efficiency commercially-viable solar panels.  To protect its trade secrets and confidential and proprietary information, Cogenra entered into four non-disclosure agreements (NDAs) with SolarCity and Silevo, dated October 29, 2010, November 8, 2011, April 17, 2014, and September 11, 2014.[1]

13.     Cogenra's development and application of shingling technology was a breakthrough in the solar power industry, resulting in solar modules that were more power-efficient, more reliable, and less expensive than conventional modules.  It was so innovative that, after holding extensive discussions with personnel from both Khosla Ventures and Cogenra, SolarCity made an offer to buy Cogenra for $155 million in September 2014.  However, rather than conducting good-faith due diligence in order to close the deal, SolarCity spent over a month examining and learning every detail of Cogenra's proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property before abruptly terminating the deal, claiming alleged "concerns" about Cogenra's intellectual property.  Despite SolarCity's "concerns," within two months of terminating the deal, the same employees at SolarCity and Silevo who had access to Cogenra's proprietary technology filed three patent applications containing descriptions of Cogenra's proprietary shingling technology, including the trade secrets and proprietary information that Cogenra had shared with SolarCity and Silevo under non-disclosure agreements.  Notably, none of SolarCity and Silevo's patent applications filed before the deal "due diligence" mentioned or involved shingling technology.

_____
[1] Under the terms of the NDAs, their existence is confidential.

14.     SolarCity and Silevo misappropriated Cogenra's trade secrets, manufacturing processes, and other intellectual property to give themselves a competitive advantage and head start in developing shingled-cell solar modules. Before working with Cogenra and conducting an extensive "due diligence" on Cogenra's innovative and propriety technology, Silevo and SolarCity had focused on making solar cells and traditional, non-shingled cell solar modules. Upon information and belief, neither SolarCity nor Silevo were capable of or even considering the manufacture of complete shingled-cell solar modules before gaining access to Cogenra's proprietary technology. Upon information and belief, SolarCity and Silevo did not have the tools, techniques, or know-how necessary to produce shingled solar cells or solar modules using Cogenra's innovative techniques. It was only by misappropriating Cogenra's proprietary technology, including its trade secrets and other intellectual property, that SolarCity and Silevo were later able to announce a claim that they set a new world record for solar panel energy efficiency.

**A.     Cogenra's Innovation in Solar Cell Technology**

15.     In 2010, Cogenra developed an innovative concentrating photovoltaic (CPV) system, which allowed for efficient generation of electricity while using a smaller number of solar cells.

16.     In 2012, Cogenra enhanced and further developed its proprietary CPV technology by implementing "shingled" cells in its CPV systems. By overlapping, or "shingling," the solar cells, Cogenra was able to produce a more reliable, efficient, and economical photovoltaic system. The shingled-cell module was able to operate at a higher efficiency and produce 10%-15% more power than conventional solar modules.

17.     The manufacturing of efficient, reliable shingled-cell solar modules was a major breakthrough in the solar power industry. Although the idea of shingling solar cells had been considered earlier, no one had been able to confirm a commercially-viable solar module using the technology. Cogenra's proprietary technologies and manufacturing techniques turned the concept of shingling into a reality, and the results were groundbreaking. Unsurprisingly, the manufacturing of Cogenra's shingled-cell solar modules required special materials, processes, and tools, which Cogenra developed on its own and either maintained as trade secrets or subsequently patented.

18.     In 2014, Cogenra once again proved that it was a pioneer in the field of photovoltaics by adapting its shingled-cell technology to be used in traditional, flat solar panels.  Cogenra called these innovative shingled-cell modules the SuperCell module (later renamed as the HyperCell module).  Whereas other front-contact cell modules at the time produced a maximum of approximately 350 watts of power, the Cogenra HyperCell shingled module delivered 400 watts with an approximately similar panel size—an increase of nearly 15%.  This set a new world record for efficiency.  *See Cogenra Sets Three World Records for Solar Module Power*, BUSINESS WIRE (Oct. 16, 2014), *available at* http://www.businesswire.com/news/home/20141016005281/en/Cogenra-Sets-World-Records-Solar-Module-Power.

19.     Cogenra's shingled-cell solar modules operated at a significantly higher efficiency compared to conventional solar modules because, in part, the shingled cells minimized the amount of surface area devoted to wiring and connections.  In addition, because the wiring is hidden in Cogenra's shingled-cell modules, the HyperCell has an improved all-black appearance.  This aesthetically pleasing, all-black design is highly desirable and superior to the traditional front-contact solar module design depicted below.

*Figure 1*



Traditional Solar Module Design          Cogenra's All-Black Design

20.     In April 2014, Cogenra submitted its groundbreaking shingled-cell technology to the Department of Energy's (DOE) SunShot Initiative grant contest, which was intended to spur photovoltaic and concentrating solar power manufacturing and supply chain companies in the U.S. by aiding the development of innovative, cost-reducing, and efficiency-increasing technology into useable manufacturing equipment and processes.  On October 22, 2014, the DOE granted Cogenra a $2 million award for its record-setting technology.  *See Cogenra Wins $2M U.S. Energy Dept. SunShot Award*, BUSINESS WIRE (Oct. 22, 2014), *available at* http://www.businesswire.com/news/home/20141022006260/en/Cogenra-Wins-2M-U.S.-Energy-Dept.-SunShot.  Again, in August 2015, Cogenra received a $5.5 million grant from the DOE's SunShot Initiative.  *See SunShot Technology to Market Incubator 10, SolarMat 3, Sunpath 2,* DEPARTMENT OF ENERGY (Nov. 16, 2015), *available at* http://energy.gov/eere/sunshot/sunshot-technology-market-incubator-10-solarmat-3-sunpath-2.

21.     In addition to the DOE grants, Cogenra was granted utility and design patents covering its shingled-cell designs and methods of manufacture, including U.S. Patent Nos.

D7,750,556; 9,356,184; 9,397,252; and 9,401,451.  Cogenra currently has multiple pending patent applications on its technology and designs.

22.     Cogenra also diligently maintained the secrecy of certain of its underlying technology.  For example, Cogenra kept as trade secrets the particular specifications of the solar cells used in the shingled-cell solar modules, the chemical and physical properties of the Electro Conductive Adhesive ("ECA") used to assemble the shingled-cell modules, and the specific tools Cogenra designed and used to cut, assemble, and cure the solar modules.  This information was highly valuable and not generally known by or readily ascertainable to competitors.  Cogenra only disclosed the fact that it was developing shingled solar panels to its vendors on a need-to-know basis.  In instances where disclosure of Cogenra's confidential trade secrets, manufacturing processes, and other intellectual property was necessary, disclosures were made pursuant to an executed non-disclosure agreement.  All Cogenra employees were required to sign confidentiality agreements, and documents that were shared outside of the company were marked with confidentiality designations.

**B.     Cogenra's Early Relationship with Silevo**

23.     In October 2010, Cogenra's CEO, Gilad Almogy, contacted Silevo's CEO, Zheng Xu, to explore Silevo's ability to manufacture solar cells for use in Cogenra's CPV modules.  On October 29, 2010, Cogenra and Silevo entered into a Reciprocal Nondisclosure Agreement ("2010 NDA"), which required the receiving party to maintain as confidential any information disclosed to it by the disclosing party.

24.     After signing the 2010 NDA, Cogenra's Chief Operating Officer and Vice President of Research and Development, Ratson Morad, met with Silevo's Chief Technology Officer, Jianming Fu, to discuss the solar cell requirements for Cogenra's CPV modules.  It was determined, however, that Silevo was not capable of producing the solar cells that Cogenra needed at that time.  Despite Silevo's claims that it produced high-efficiency cells, Silevo had difficulty making reliable cells.  For example, the copper-based electrical contacts peeled off some of the Silevo solar cells.  In short, Silevo was not ready to manufacture reliable cells on the scale that Cogenra needed, so Cogenra decided to use a different manufacturer.

25. Two years later, on October 10, 2012, Dr. Almogy and Mr. Morad of Cogenra met with Mr. Xu and Mr. Fu of Silevo again to discuss Silevo's ability to manufacture cells for use in Cogenra's improved shingled-cell CPV modules. Cogenra was interested in Silevo's claims that it produced solar cells that were more energy efficient than other manufacturers' solar cells.

26. On January 7, 2013, Cogenra sent Silevo a preliminary purchase order for solar cells. On January 22, 2013, Cogenra sent Silevo further technical specifications for the particular design of Cogenra's proprietary shingled solar cells, pursuant to the 2010 NDA. This small order was to assess Silevo's capabilities of being a high volume manufacturer.

27. When Cogenra received the first batch of solar cells from Silevo, it was clear that Silevo did not understand how the shingled-cell technology worked. Silevo manufactured the solar cells with a critical part—the copper busbars—on the wrong side of the solar cells, despite clear specifications. Upon information and belief, Silevo had not considered shingled-cell technology at that time, and was unaware of how it could be used. Cogenra had to re-explain to Silevo the fundamentals of shingled-cell technology, and Silevo reproduced a second batch of solar cells at its own cost.

28. When Cogenra tested Silevo's corrected batch of solar cells in May 2013, the solar cells' performance was disappointing. Despite Silevo's claims that it manufactured high-efficiency solar cells compared to other manufacturers, Cogenra's testing indicated that Silevo's cells only yielded a 2% performance gain over the cells that Cogenra was already using.

29. Over the next year, Cogenra worked closely with Mr. Fu, Benjamin Heng (Silevo's Vice President of Product Engineering), and several other Silevo engineers to try to manufacture efficient, cost-effective shingled-cells for Cogenra's CPV system. Among other efforts, Cogenra proposed specific changes to Silevo's solar cells, shared additional technical specifications, shared test results for Silevo's solar cells, and discussed optimal layouts and configurations for the cells within a solar module.

30. By May 2014, after a year-and-a-half working with Silevo to build a shingled-cell module for its CPV system, Cogenra once again determined that Silevo was incapable of

consistently producing reliable, cost-efficient solar cells on a large scale. Therefore, Cogenra went with a different manufacturer.

**C.  Cogenra Integrates Its Innovative Shingling Into Flat Solar Panels**

31.   In 2014, Cogenra integrated the shingling technology into traditional, flat solar panels.

32.   In 2014, Cogenra also began looking for new investors, including potential opportunities to be acquired by larger solar companies. By mid-2014, several solar companies had shown interest in acquiring Cogenra.

33.   As part of this effort to obtain new investors, Dr. Almogy contacted Richard Lim, a Managing Director with GSR Ventures ("GSR"). GSR had previously invested in Silevo, and Mr. Lim asked if Cogenra would allow Mr. Xu of Silevo to perform due diligence on Cogenra's HyperCell technology. Having dealt with Mr. Xu and Silevo in the past, Cogenra agreed, and a meeting was arranged between Cogenra and Mr. Xu for June 20, 2014.

34.   On June 16, 2014, four days before the planned meeting, SolarCity announced its plan to acquire Silevo.

35.   During the June 20, 2014 meeting, Dr. Almogy disclosed to Mr. Xu various details regarding Cogenra's HyperCell technology. Mr. Xu was impressed by Cogenra's shingling technology and its incorporation into flat solar modules. Mr. Xu noted that Silevo was being acquired by SolarCity and stated, in words or in substance, that Cogenra's shingling technology was a perfect match for SolarCity. Dr. Almogy was interested in a potential acquisition of Cogenra by SolarCity, and the parties agreed to a second meeting to further discuss the technology and possible deal.

36.   Representatives from Silevo and Cogenra met again on June 30, 2014. At this meeting, Cogenra gave Silevo a more detailed presentation of Cogenra's proprietary shingling technology. Cogenra described the numerous benefits of its HyperCell technology including: eliminating gaps and shading, reducing resistance by using smaller rectangular cells, improving reliability, and reducing manufacturing costs. Cogenra explained that its HyperCell shingled-cell modules improve photovoltaic performance compared to conventional cells by approximately 13%.

Cogenra further disclosed that, with its new HyperCell technology, it was on track for setting the world record for the most efficient mono-crystalline solar modules in the third quarter of 2014.

37.     When Dr. Almogy asked for an introduction to SolarCity, Mr. Xu insisted that Cogenra and Silevo first build a working shingled-cell solar module with Silevo's solar cells. Dr. Almogy told Mr. Xu that Cogenra was considering other acquisition offers, and that, as a result, the parties had to move quickly with any potential SolarCity deal. Despite this, Mr. Xu wanted Cogenra to first prove that its innovative shingled-cell technology could produce the claimed 12%-15% efficiency gains using Silevo's solar cells. Mr. Xu also insisted that Cogenra present SolarCity with a working prototype.

38.     At or soon after the June 30, 2014 meeting, the parties agreed to co-develop a HyperCell shingled-cell module prototype to deliver to SolarCity. Silevo was to manufacture the solar cells for the prototype module.

39.     Over the next two months, July and August 2014, Cogenra and Silevo worked closely to develop a shingled-cell solar module to present to SolarCity. All of the disclosures were subject to the NDA entered into by the parties. It was understood between the parties that all information shared between Cogenra and Silevo during this time was confidential and only for the purpose of introducing Cogenra to SolarCity. In correspondence, Mr. Xu expressed the importance of completing the project before he could make the introduction to SolarCity. For example, on July 3, 2014, Mr. Xu wrote in an email, "We need to demonstrate the world highest module efficiency!"

40.     During this two-month period, Messrs. Xu, Fu, and Heng and several other Silevo employees were provided access to more of Cogenra's confidential and proprietary information, including Cogenra's confidential trade secrets, manufacturing processes, and other intellectual property. For example, Silevo was provided full access to Cogenra's entire manufacturing process: Silevo, among other things, saw how Cogenra scored and cut the individual solar cells with a laser scribe, assembled its shingled-cell module, applied and cured the specific ECA adhesive, and set the cells. Cogenra also provided detailed schematics for different metallization schemes for the HyperCells and detailed data regarding thermal cycling properties of the ECA adhesive. Cogenra provided access to its trade secrets and intellectual property under the NDA between the parties.

41.     During this two-month period, pursuant to the NDA, Cogenra provided Silevo with additional information regarding its underlying research and test results for the shingled-cell modules.

42.     On or about August 11, 2014, Cogenra finalized plans for a HyperCell shingled module prototype and asked Silevo to produce 200 solar cells to Cogenra's specification. On or about August 15, 2014, Cogenra received the batch of solar cells from Silevo and built the first HyperCell shingled-module using Silevo's solar cells.

43.     Over the next week, Silevo evaluated the prototype HyperCell shingled module and, upon information and belief, confirmed that it did in fact produce the 10%-15% efficiency gains that Cogenra claimed.

44.     On or about August 17, 2014, Cogenra sent Silevo a confidential presentation that was to be used with the meeting with SolarCity, asking Silevo to proceed with making introductions between Cogenra and SolarCity. The confidential presentation discussed Cogenra's proprietary HyperCell shingled modules, disclosing how the modules yielded the highest power efficiency and were highly reliable and cost competitive. This presentation was marked confidential.

**D.     Acquisition Discussions with SolarCity**

*1.     Preliminary Discussions and Due Diligence*

45.     On August 20, 2014, Mr. Xu of Silevo arranged for a meeting between Cogenra and SolarCity. On August 21, 2014, Dr. Almogy met with Tanguy Serra, Chief Operations Officer of SolarCity, at SolarCity's headquarters in San Mateo, California. At this meeting, Dr. Almogy discussed Cogenra's proprietary HyperCell technology and the potential Cogenra-SolarCity acquisition. Upon information and belief, Mr. Serra was impressed with Cogenra's technology and expressed to Dr. Almogy that SolarCity was interested in exploring a potential acquisition of Cogenra.

46.     On or about August 22, 2014, Mr. Serra emailed Dr. Almogy to request a full shingled-cell module for SolarCity to inspect. Cogenra delivered the prototype HyperCell module to SolarCity on or about August 25, 2014. The module, which featured Cogenra's sleek all-black design based on shingled-cells, sat in SolarCity's boardroom for the rest of the due diligence period.

47.     Separately, on or about August 25, 2014, Cogenra sent Silevo additional design schematics in response to Silevo's request.  Cogenra also shared with Silevo and SolarCity a presentation that included updated information regarding the HyperCell's reliability.  This presentation was also marked confidential.

48.     While these discussions were ongoing, Khosla Ventures continued to invest in, fund, and support Cogenra with financial and other resources, including by making multiple bridge loans for millions of dollars and participating in acquisition discussions with SolarCity and other competing bidders for Cogenra.

49.     Dr. Almogy, Mr. Serra, and Samir Kaul, a founding general partner at Khosla Ventures, had a subsequent meeting on or about August 26, 2014.  SolarCity was aware of Khosla Ventures' support and financial investments in Cogenra.  After the meeting, Mr. Serra stated in words or in substance that SolarCity would need to see more of Cogenra's technology, as well as its intellectual property, as part of the "deal due diligence" in order to evaluate whether SolarCity would make an offer to acquire Cogenra.  Specifically, Mr. Serra requested that Mr. Xu of Silevo be provided further access to Cogenra's technical information and facilities to perform a technical due diligence.  Mr. Serra represented to Cogenra that if the results of the technical due diligence were good, Cogenra would have a term sheet the following week.

50.     On or about August 27, 2014, Cogenra met with Mr. Fu of Silevo to discuss Cogenra's proprietary research regarding the necessary mechanical properties of the ECA adhesive in order to construct reliable and efficient shingled-cell solar modules.  Cogenra presented a detailed bill of materials and corresponding costs of the components and subcomponents of the Cogenra HyperCell module.  The bill of materials was labeled confidential.

51.     On or about August 28, 2014, Cogenra had a conference call with David Schonberg, SolarCity's Head of Engineering, to discuss the details of Cogenra's proprietary HyperCell technology.  On the call, Cogenra and SolarCity reviewed a Cogenra presentation discussing the benefits of Cogenra's proprietary shingling technology, which included increased power production by reducing gaps and shading and minimizing resistance; increased reliability by eliminating soldering and ribbons; reduced costs by automating manufacturing; and increased flexibility by

optimizing voltage and current and providing different form factors. The presentation further emphasized the HyperCell's all-black aesthetics. Cogenra also presented a separate presentation discussing the flexible configuration options that the HyperCell permitted. Both presentations were marked confidential. Cogenra also shared with SolarCity a confidential datasheet with specific details regarding its "M-Series" HyperCells.

52.     By July 2015, Cogenra and Khosla Ventures had held advanced discussions with other partners regarding a potential acquisition of Cogenra. While discussions with SolarCity were ongoing in August 2015, Cogenra and Khosla Ventures continued to receive significant interest and acquisition offers from other prominent solar companies. By the end of August, Cogenra had received at least three significant acquisition offers of high value, including one or more offers that Cogenra and Khosla Ventures would have accepted in the absence of a bid from SolarCity. These offers, however, had expiration dates. Cogenra informed Mr. Xu and Mr. Serra about these various offers, and urged SolarCity to move quickly with its own acquisition discussions. In words or in substance, SolarCity represented to Cogenra and Khosla Ventures that it only made offers and exchanged term sheets when SolarCity was certain that a deal would go through.

53.     The following week, on or about September 2, 2014, Peter Rive, co-founder and Chief Technology Officer of SolarCity, and Mr. Serra visited Cogenra's headquarters in Mountain View. Mr. Rive and Mr. Serra toured Cogenra's pilot HyperCell manufacturing plant and analyzed Cogenra's proprietary technology. Mr. Rive and Mr. Serra subsequently discussed Cogenra's value proposition with Dr. Almogy.

54.     Later that day, Mr. Serra emailed Dr. Almogy, explicitly telling him to not accept any other acquisition offer. Mr. Serra's message was further communicated to Khosla Ventures. This signaled to Cogenra and Khosla Ventures that SolarCity intended to negotiate and conduct any remaining due diligence in good faith with the goal of completing its acquisition of Cogenra.

### 2.     SolarCity Sends a Term Sheet and Insists On a 90-Day Exclusivity Period

55.     On September 3, 2014, SolarCity sent Cogenra a term sheet. Over the next two days, Mr. Kaul from Khosla Ventures had three meetings with SolarCity to discuss the terms of the acquisition. Mr. Kaul first met with Mr. Serra at Khosla Ventures' headquarters in Menlo Park,

California and then at SolarCity's headquarters in San Mateo. Mr. Kaul then met with Mr. Serra and Mr. Rive on September 4, 2014 at a restaurant in San Francisco. At the first meeting, Mr. Serra assured Mr. Kaul that SolarCity would complete its acquisition of Cogenra on mutually acceptable terms and, in words or in substance, that SolarCity's word was its bond. Mr. Serra reiterated in words or in substance that SolarCity only offered term sheets for deals that it intended to complete, and that it intended to acquire Cogenra. At the third meeting between Khosla Ventures and SolarCity, Mr. Kaul and Mr. Rive shook hands on the deal. After the handshake, Mr. Serra said in words or in substance that Mr. Rive was SolarCity's decision maker and that his handshake ensured that SolarCity had agreed that it would acquire Cogenra.

56. On September 5, 2014, SolarCity sent Cogenra a term sheet, offering a purchase price of up to $155,000,000. The parties subsequently negotiated and executed a Mutual Nondisclosure Agreement ("2014 NDA") on September 11, 2014. The 2014 NDA protected all confidential information relating to the acquisition, including information that was disclosed prior to the execution of the agreement.

57. Separately, SolarCity insisted that Cogenra agree in writing to a 90-day exclusivity period. During the exclusivity period, SolarCity would be granted access to all of Cogenra's proprietary technology, subject to the 2014 NDA, in order to conduct additional due diligence. SolarCity represented, in words or substance, that it would conduct the remaining due diligence in good faith with the goal of completing the acquisition of Cogenra.

58. At the time, SolarCity was aware that Cogenra had other high value acquisition offers from other solar companies.

59. Based on SolarCity's repeated assurances that its acquisition of Cogenra would go through and that its word was its bond, the operating history between Cogenra and Silevo (which SolarCity had acquired), and SolarCity's representation that it would complete the remaining due diligence in good faith with the goal of completing the acquisition, Cogenra executed the September 5, 2014 Exclusivity Agreement and agreed to negotiate exclusively with SolarCity until December 4, 2014. Upon entering the Exclusivity Agreement, and in reliance on SolarCity's assurances about the acquisition, Cogenra contacted at least two of the competing bidders and turned down their offers to

acquire Cogenra.  In addition, at least one additional offer for Cogenra lapsed during the exclusivity period.

### 3. Cogenra Fully Discloses Its Proprietary Technology, Including Its Trade Secrets, Manufacturing Processes, and Other Intellectual Property

60.  Over the next month, in reliance on SolarCity's repeated assurances that it would acquire Cogenra and/or conduct its technical due diligence in good faith, and under the protection of at least the 2014 NDA, Cogenra gave SolarCity and Silevo access to Cogenra's proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property. This information included specific schematics and guidelines for busbars and electrical connectors, metallization patterns, cell designs and arrangements, wafers, solar modules, and other components; information regarding various subcomponent and materials vendors; unpublished patent applications and annotated patent claims directed to shingled-cell solar modules and the manufacture of these modules; cost models, analyses, and comparisons with competitors; details regarding performance and optimization, cell and module efficiency, power, and form factor; Renewable Energy Test Center test results for the cells; and proprietary bills of materials for the modules.

61.  Furthermore, Cogenra disclosed to SolarCity and Silevo numerous proprietary technologies, including trade secrets, manufacturing processes, and other intellectual property that were necessary to effectively manufacture and construct Cogenra's proprietary HyperCells, including at least the particular processes for laser-scribing and cleaving the solar cells to cut them into smaller rectangular-shaped cells, the use of a 2x6 inch cell for optimal performance, the particular characteristics of the ECA adhesive, the process for assembling the shingled-cell module from the individual solar cells, the technique for applying the ECA adhesive, and the particular process of curing the ECA adhesive.  Cogenra also disclosed the underlying proprietary tools and machinery, as well as specific vendors, required for the manufacturing process.  Cogenra provided these disclosures under the NDA between the parties.

62.  Furthermore, in reliance on SolarCity's repeated assurances that it would acquire Cogenra, and because of the Exclusivity Agreement insisted upon by SolarCity, Cogenra and Khosla Ventures allowed its other pending acquisition offers to expire.

63.     Over the next month, Silevo began to raise purported concerns about the acquisition and the feasibility of Cogenra's shingled-cell solar modules.  Specifically, Mr. Heng, Silevo's VP of Product Engineering, repeatedly raised questions about the purchase price and the performance and reliability of Cogenra's modules, despite the numerous test results that Cogenra presented demonstrating that the solar modules did, in fact, produce the claimed efficiency and reliability.  In one particular conference call on or around September 25, 2014, when Cogenra responded to Mr. Heng's attacks on Cogenra's proprietary technology, Mr. Heng proclaimed to be a leading expert on solar modules.  Mr. Heng's conduct and hostile nature during the due diligence caused Cogenra great concern because they believed Mr. Heng had a personal agenda—to prevent SolarCity's acquisition of Cogenra.

64.     On or about October 7, 2014, Dr. Almogy and Mr. Serra met to discuss the state of the deal.  Mr. Serra stated that technical due diligence showed that the HyperCell's reliability, costs, and efficiency were as Cogenra had promised.  This result refuted Mr. Heng's purported concerns about the reliability and efficiency of Cogenra's HyperCell technology.  However, Mr. Serra claimed that SolarCity believed Cogenra's IP was not as strong as it had thought.

65.     Then, on October 10, 2014, despite SolarCity's prior repeated assurances that it would acquire Cogenra and that its word was its bond, and conduct and representations from SolarCity that led Cogenra to believe that SolarCity would conduct due diligence on Cogenra's proprietary technology in good faith with the goal of completing the acquisition, SolarCity emailed Cogenra to terminate the deal, claiming that "the IP of Cogenra is not as strong as it was represented to be."  SolarCity did not provide any further notice or explanation for backing out of the $155,000,000 deal.

66.     As a result of having relied on SolarCity's repeated assurances about the acquisition and agreeing to the exclusivity period SolarCity demanded, Cogenra and Khosla Ventures were left without acquisition offers for Cogenra, having passed on other lucrative offers to complete the deal with SolarCity.  Also, as a result of the previous acquisition offers and the representations of Silevo and SolarCity about a potential acquisition, Khosla Ventures had continued to invest in, fund, and

support Cogenra with financial and other resources during the summer and fall of 2014, including by making multiple bridge loans for millions of dollars.

67.     In September 2015, SunPower acquired Cogenra.  *See* SunPower Adds Innovative New Solar Panel Product Line, SunPower (Nov. 12, 2015), *available at* http://newsroom.sunpower.com/2015-11-12-SunPower-Adds-Innovative-New-Solar-Panel-Product-Line-Enhancing-Reach-to-New-Customer-Segments-and-Global-Markets. Khosla Ventures continued to fund Cogenra's operations between SolarCity's termination in October 2014 and SunPower acquisition of Cogenra nearly one year later.

E.     **SolarCity and Silevo Misappropriate Cogenra's Confidential Trade Secrets and Intellectual Property**

68.     Upon information and belief, either from the outset of its acquisition discussions with Cogenra, or, alternatively, at some point prior to terminating its acquisition of Cogenra in October 2014, SolarCity decided that it would not complete the agreed-upon acquisition and that instead it would make and sell its own shingled-cell solar panel.  On information and belief, in conjunction with making this determination SolarCity decided to use and did in fact use the due diligence period to gain as much information as possible about Cogenra's proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property.  Upon information and belief, once SolarCity gathered the technical information and know-how that it needed, SolarCity misappropriated these Cogenra trade secrets and terminated the deal for the acquisition of Cogenra. By doing so, SolarCity gave itself and Silevo a competitive advantage and head start in developing shingled solar panels, and knowingly prevented Cogenra from entertaining other good faith acquisition offers.

69.     Upon information and belief, SolarCity and Silevo intended to and did use Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property to draft and file patent applications using Cogenra's proprietary technology, to establish an in-house solar module manufacturing unit to compete with Cogenra, to copy Cogenra's proprietary shingled-cell solar modules, and to gain the technical expertise to produce an imitation solar module that implements Cogenra's all-black shingled aesthetics.

### 1. SolarCity and Silevo Copied Cogenra's Intellectual Property to File Its Own Patent Applications

70.     Upon information and belief, after Silevo and SolarCity evaluated and reviewed Cogenra's expertise, know-how, proprietary technology, and trade secrets, Silevo began filing patent applications that misappropriated Cogenra's proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property.  Within two months of terminating the deal because Cogenra's intellectual property was allegedly "not as strong as it was represented to be," Silevo filed three applications describing Cogenra's proprietary technology.

71.     On October 8, 2014, just two days *before* terminating the deal with Cogenra, Mr. Heng, Mr. Fu, and Mr. Xu—the same people who had full access to Cogenra's confidential information—filed U.S. Patent Application No. 14/510,008 ("the '008 application").  A true and accurate copy of the '008 application is attached hereto as Exhibit 1 to the First Amended Complaint.  The '008 application was a continuation-in-part ("CIP") of Silevo's prior U.S. Patent Application No. 14/153,608 ("the '608 application"), entitled "Module Fabrication of Solar Cells with Low Resistivity Electrodes."  The '008 application claimed the benefit of U.S. Patent Application No. 61/751,733 ("the '733 application"), entitled "Module Fabrication using Bifacial Tunneling Junction Solar Cells with Copper Electrodes."

72.     With the '008 application, Silevo modified the earlier '608 application to include Cogenra's proprietary shingling technology that was made available to Silevo and SolarCity subject to non-disclosure agreements.  Upon information and belief, Silevo's '008 application describes Cogenra shingling technology, as outlined in at least paragraphs [0071] to [0075] and depicted in at least drawings 5F-5I.  These drawings and descriptions did not appear anywhere in Silevo's earlier-filed patent application.  Indeed, the concept of "shingling" or overlapping solar cells does not appear in the '608 application.  As shown below, Silevo's '008 application describes and misappropriates Cogenra's proprietary shingled cell design:



*Figure 2*

Cogenra Shingled Cell Design          Silevo Patent App. No. 14/510,008

(from WO 2010/074826)

73.      Upon information and belief, Silevo's drafting and filing of the '008 application constitutes a violation of at least the parties' 2014 NDA and the 2010 NDA.  Specifically, the 2010 NDA limits Silevo's use of any Cogenra confidential information disclosed under the agreement to the sole purpose of Silevo producing solar cells for Cogenra, and the 2014 NDA limits SolarCity and Silevo's use of any Cogenra confidential information disclosed under the agreement to the sole purpose of evaluating the possibility of SolarCity acquiring Cogenra.  Silevo and SolarCity's use of Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property to draft and file the '008 application breached the terms of both agreements.

74.      Less than a month later, on November 4, 2014, Silevo filed a provisional patent application, U.S. Patent Application No. 62/075,134 ("the '134 application").  A true and accurate copy of the '134 application is attached hereto as Exhibit 2 to the First Amended Complaint.  Once again, Mr. Heng and Mr. Xu are named inventors on this patent application.

75.      Upon information and belief, Silevo and SolarCity again improperly used Cogenra confidential information to draft this provisional application, as evidenced in at least paragraphs [0065] to [0070] and at least Figures 13A-13C.  Again, this application reflects Cogenra's

proprietary shingled cell design as well as manufacturing methods used to create the shingled cells, in direct violation of the parties' various non-disclosure agreements, as depicted below.

*Figure 3*

 

Cogenra Shingled Cell Design                    Silevo Patent App. No. 62/075,134

(from WO 2010/074826)

76.     Upon information and belief, Silevo's drafting and filing of the '134 application also constitutes a violation of at least the parties' 2014 NDA and the 2010 NDA.  Specifically, the 2010 NDA limits Silevo's use of any Cogenra confidential information disclosed under the agreement to the sole purpose of Silevo producing solar cells for Cogenra, and the 2014 NDA limits SolarCity and Silevo's use of any Cogenra confidential and proprietary technology, including its trade secrets and other intellectual property disclosed under the agreement for the sole purpose of evaluating the possibility of SolarCity acquiring Cogenra.  Silevo and SolarCity's use of Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property, to draft and file the '134 application breached the terms of both the 2010 and 2014 NDAs.

77.     On December 8, 2014, Silevo filed another application, U.S. Patent Application No. 14/563,867 (Pub. No. US 2015/0090314 A1), entitled "High Efficiency Solar Panel" ("the '867 application").  A true and accurate copy of the '867 application is attached hereto as Exhibit 3 to the First Amended Complaint.  Mr. Heng and Mr. Xu are also named inventors on this patent

application. The '867 application was a continuation-in-part of the '008 and '608 applications and claims the benefit of the '134 and '733 applications.

78. Upon information and belief, Silevo and SolarCity used Cogenra's confidential information in drafting the '867 application, as evidenced in at least paragraphs [0064] to [0073] and at least Figures 13A-13C. Again, this application reflects Cogenra's proprietary shingled-cell design and manufacturing methods, in direct violation of the parties' agreements.

*Figure 4*




Cogenra Shingled Cell Design        Silevo Patent App. No. 14/563,867

(from WO 2010/074826)

79. Upon information and belief, Silevo's drafting and filing of the '867 application also constitutes a violation of at least the parties' 2014 NDA and the 2010 NDA. Specifically, the 2010 NDA limits Silevo's use of any Cogenra confidential information disclosed under the agreement to the sole purpose of Silevo producing solar cells for Cogenra, and the 2014 NDA limits SolarCity and Silevo's use of any Cogenra confidential information disclosed under the agreement to the sole purpose of evaluating the possibility of SolarCity acquiring Cogenra. Silevo and SolarCity's use of Cogenra's confidential and proprietary information, including its trade secrets, manufacturing processes, and other intellectual property, to draft and file the '867 application breached the terms of both the 2010 and 2014 NDAs.

80. Notably, Silevo had filed two patent applications before the Cogenra "due diligence" review, and neither described a shingled-cell configuration. Instead, Silevo's earlier applications

only describe traditional, non-shingled cell designs, as shown in U.S. Patent Application No. 14/153,608, filed January 13, 2014:

***Figure 5***



Silevo Patent Application No. 14/153,608, Fig. 5C

81.     In the '008, '134, and '867 patent applications, Silevo describes the ***same*** shingling technology that the purported inventors, including Mr. Heng, questioned during the deal due diligence.  In fact, only two weeks before Silevo filed the '008 patent application, Ben Heng—a self-proclaimed module expert—insisted that Cogenra's shingled-cell technology was not feasible.  Furthermore, the '008, '134, and '867 applications themselves are evidence that Silevo misappropriated Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property.  Specifically, SolarCity was allegedly considering acquiring Cogenra solely for its proprietary shingled-cell solar modules.  Upon information and belief, if Silevo had, in fact, independently developed the shingling technologies underlying the '008, '134, and '867 applications, there would have been no reason for SolarCity to engage in acquisition discussions with Cogenra.  Moreover, there would have been no reason for the named inventors on the '008, '134, and '867 applications—namely Mr. Fu, Mr. Xu, and Mr. Heng— to perform due diligence on Cogenra's proprietary shingling technology.

82.     Upon information and belief, until at least June 30, 2016, SolarCity and Silevo continued prosecuting applications that described shingling and related to the '008, '134, and '867 patent applications.

   **2.     *Silevo Misappropriated Cogenra's Trade Secrets and Intellectual Property for Its Record-Breaking Solar Module***

83.     In 2015, SolarCity and Silevo announced that they had constructed a record-breaking high efficiency shingled-cell solar module.  Upon information and belief, Silevo modified or otherwise used the module or the technology embodied within that Cogenra provided to SolarCity as

part of the deal due diligence in order to establish this world record. Upon information and belief, Silevo's use of Cogenra's solar module violated at least the parties' 2014 NDA and the 2010 NDA. Specifically, the 2010 NDA limits Silevo's use of any Cogenra confidential information disclosed under the agreement to the sole purpose of Silevo producing solar cells for Cogenra, and the 2014 NDA limits SolarCity and Silevo's use of any Cogenra confidential information disclosed under the agreement to the sole purpose of evaluating the possibility of SolarCity acquiring Cogenra.

84. Upon information and belief, Silevo modified or otherwise used Cogenra's solar module because it would have been impossible for Silevo to independently develop its own record-breaking shingled-cell solar module in just 21 days, between October 10, 2014 (when SolarCity terminated the deal with Cogenra) and October 31, 2014 (when testing was conducted for the alleged record-breaking module). *First,* upon information and belief, Silevo did not have the technical capabilities or independent know-how to produce a shingled-cell solar module. *Second,* throughout the SolarCity due diligence period, Silevo repeatedly questioned the feasibility of Cogenra's proprietary shingled-cell solar modules, which demonstrates that Silevo was not independently developing shingled-cell technology during the due diligence period. Upon information and belief, it would therefore have been impossible for Silevo to independently develop the specific tools, processes, and know-how to manufacture a record breaking shingled-cell solar module between October 10 and October 31, 2014. As such, upon information and belief, Silevo used Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property, to claim that Silevo broke the world record for efficiency, in violation of the 2014 NDA and 2010 NDA.

85. Alternatively, even if Silevo had been able to manufacture its own shingled-cell solar module (as opposed to submitting Cogenra's solar module), upon information and belief, Silevo would have only been able to manufacture its module using Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property. This would also constitute a breach of the 2014 NDA and the 2010 NDA.

### 3. SolarCity Copied Cogenra's Sleek and Aesthetically Pleasing "All-Black" Shingled Solar Module Designs

86.     Upon information and belief, SolarCity and Silevo offer for sale products incorporating an all-black design based on shingled-cells, touting the product's desirable aesthetics. *See Tesla/SolarCity: First look at new Silevo solar panel that Musk has been boasting about for its aesthetic features*, ELECTREK (Aug. 1, 2016), *available at* https://electrek.co/2016/08/01/tesla-solarcity-first-look-silevo-solar-panel-musk-aesthetic/:

***Figure 6***



87.     For example, during SolarCity's 2015 Analyst Day presentation, SolarCity discussed its solar panel's "breakthrough in shingling technology" and "aesthetics." *See SolarCity 2015 Analyst Day, Delivering Better Energy*, at 66 (attached hereto as Exhibit 4 to the First Amended Complaint).

88.     Upon information and belief, Elon Musk, SolarCity's Chairman, has touted Silevo's solar panel technology and aesthetics:

> There's the Silevo acquisition, which I think it [sic] the best technology out there for high-efficiency, low-cost solar panels. And at the same time, very significantly improving the aesthetics of the solar panels. I think there's quite a radical difference

between having solar panels on your roof that actually make your house look better

versus ones that do not, I think it's going to be a night-and-day difference.

*See Tesla/SolarCity: First look at new Silevo solar panel that Musk has been boasting about for its*

*aesthetic features*, ELECTREK (Aug. 1, 2016), *available at* https://electrek.co/2016/08/01/tesla-

solarcity-first-look-silevo-solar-panel-musk-aesthetic/; *see also Elon Musk: we can make Solar*

*Panels aesthetically pleasing and raise house values*, TESLA UPDATES (June 22, 2016), *available at*

http://www.teslaupdates.co/2016/06/elon-musk-wants-to-make-solar-panels.html ("If you make the

house look more beautiful you raise the value of the house.").

89.    Moreover, SolarCity and Silevo's misappropriation of Cogenra's proprietary

technology relating to the design, manufacture, and sale of Cogenra's HyperCell solar modules

constitutes a violation of at least the parties' 2014 NDA and 2010 NDA.  Specifically, the 2010

NDA limits Silevo's use of any Cogenra confidential information disclosed under the agreement to

the sole purpose of Silevo producing solar cells for Cogenra, and the 2014 NDA limits SolarCity and

Silevo's use of any Cogenra confidential information disclosed under the agreement to the sole

purpose of evaluating the possibility of SolarCity acquiring Cogenra.  Therefore, Silevo and

SolarCity's use of Cogenra's confidential and proprietary technology, including its trade secrets,

manufacturing processes, and other intellectual property to design, manufacture, and sell copies of

Cogenra's all-black shingled-cell solar modules breached the terms of these agreements.

### 4.    *SolarCity Misappropriated Cogenra's Trade Secrets and Intellectual Property to Build a Solar Module Manufacturing Factory*

90.    Upon information and belief, SolarCity has also been using Cogenra's confidential

and proprietary technology, including its trade secrets, manufacturing processes, and other

intellectual property to establish a solar module manufacturing facility in Buffalo, New York.

Throughout the parties' discussions, including during the due diligence period, SolarCity and Silevo

had focused on making solar *cells*, but never revealed an interest in establishing its own in-house

*module* manufacturing unit (which would have obviated the need for acquiring Cogenra).  Indeed,

based on information demands and questions from Silevo over the years, Silevo had made clear that

it did not have the know-how to manufacture complete *modules* to meet its own standards.

91.     Upon information and belief, SolarCity now has a project to replicate Cogenra's proprietary shingled modules using its in-house manufacturing unit.  For example, on December 15, 2015, in its "2015 Analyst Day" presentation, SolarCity discussed its "breakthrough in shingling technology" and its higher efficiency solar modules.  *See* Ex. 4 at 66.  Upon information and belief, SolarCity's project that implements "shingling technology" improperly uses Cogenra's trade secrets, manufacturing processes, and other intellectual property.

92.     Upon information and belief, as of October 2016, SolarCity has continued integrating Silevo's solar technology into its Buffalo manufacturing facility and intends to use Silevo's technology to manufacture solar modules.

93.     During a November 1, 2016 investors meeting between Tesla Motors Inc. ("Tesla") and SolarCity investors, Tesla and SolarCity discussed plans to develop a "hybrid" solar module that integrates Silevo technology and Panasonic Corporation technology.  *See What Tesla Motors, Inc. Wants You to Know About Its SolarCity Acquisition*, THE MOTLEY FOOL (Nov. 1, 2016), *available at* http://www.fool.com/investing/2016/11/01/what-tesla-motors-inc-wants-you-to-know-about-its.aspx.  Upon information and belief, these "hybrid" modules will use Silevo technology that benefits from Silevo's knowledge of Cogenra's trade secrets, manufacturing processes, and other intellectual property.

94.     That SolarCity lacked the requisite manufacturing expertise to achieve these gains on its own is further evidenced by SolarCity's employment offers to three Cogenra employees, in violation of the non-solicitation clause in the 2014 NDA.  Specifically, in February 2015, SolarCity extended employment offers to two key Cogenra employees with crucial shingled-cell know-how and expertise.  Indeed, SolarCity was familiar with at least one of the Cogenra engineers from the acquisition due diligence period.  SolarCity withdrew the employment offers once Cogenra confronted SolarCity about violating the 2014 NDA.

95.     Upon information and belief, SolarCity's construction of its in-house solar module manufacturing unit constitutes a violation of at least the parties' 2014 NDA and the 2010 NDA.  Specifically, the 2010 NDA limits Silevo's use of any Cogenra confidential information disclosed under the agreement to the sole purpose of Silevo producing solar cells for Cogenra, and the 2014

NDA limits SolarCity and Silevo's use of any Cogenra confidential information disclosed under the agreement to the sole purpose of evaluating the possibility of SolarCity acquiring Cogenra. Silevo and SolarCity's use of Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property to construct a solar module manufacturing unit breaches the terms of both agreements.

96.     Upon information and belief, SolarCity's misappropriation is ongoing and SolarCity continues to exploit Cogenra's confidential and proprietary technology as described above.

**F.     SolarCity Caused Cogenra and Khosla Ventures to Forego Other Significant Acquisition Opportunities**

97.     Prior to and continuing during the acquisition discussions with SolarCity, Cogenra and Khosla Ventures had received and were considering significant acquisition offers from at least three other companies. Cogenra and Khosla Ventures made SolarCity aware of these discussions with these other potential acquirers at the August 21, 2014 meeting between SolarCity and Cogenra. By early September, Cogenra and Khosla Ventures had significant acquisition offers of high value, including one or more offers that Cogenra and Khosla Ventures would have accepted in the absence of SolarCity's offer.

98.     On September 2, 2014, SolarCity explicitly asked Cogenra and Khosla Ventures not to accept the other offers. SolarCity then insisted that Cogenra sign an Exclusivity Agreement on September 5, 2014. This Exclusivity Agreement required Cogenra to negotiate exclusively with SolarCity and not participate in other acquisition discussions for ninety days. Because of the Exclusivity Agreement and SolarCity's guarantee that SolarCity would complete the acquisition, Cogenra fulfilled its obligations and allowed its other pending acquisition offers to expire.

99.     As previously alleged, upon information and belief, either at the outset of its acquisition discussions with Cogenra, or, alternatively, prior to terminating its acquisition of Cogenra in October 2014, SolarCity concluded that Cogenra did not have intellectual property that could block SolarCity from building its own shingled-cell solar panel. Upon concluding this, SolarCity secured and/or used the due diligence period to gain as much information regarding Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing

processes, and other intellectual property. Therefore, despite SolarCity's continued assurances that it would carry through with the deal and conduct good-faith due diligence with the goal of completing the acquisition once it offered a term sheet, SolarCity in fact had no intention of acquiring Cogenra after it was given access to Cogenra's proprietary technology and intellectual property.

100. Cogenra and Khosla Ventures relied upon SolarCity's false representations and rejected other offers for Cogenra. This caused Cogenra and Khosla Ventures to forego significant acquisition offers from the other companies. In addition, Khosla Ventures kept certain bridge loans, totaling over $2 million, invested in Cogenra upon the expectation that SolarCity would conduct due diligence on Cogenra's proprietary technology in good faith with the goal of completing the acquisition and continued to invest other resources in Cogenra's agreed-upon acquisition by SolarCity. Khosla Ventures continued to fund Cogenra's operations following SolarCity's October 2014 termination of the acquisition.

101. As a result of SolarCity's false representations and misleading conduct, Cogenra and Khosla Ventures decided to forego these other acquisition offers and suffered significant harm.

**G.** **SolarCity and Silevo Induced Khosla Ventures to Continue Its Investment into Cogenra under False Pretenses**

102. Khosla Ventures was the majority shareholder of Cogenra, owning approximately 80% of the company. Khosla Ventures provided support and assistance in all aspects of Cogenra's business and made substantial investments in the company. In addition, Khosla Ventures negotiated with potential acquisition partners on behalf of Cogenra, including SolarCity, and continued its financial support of Cogenra throughout acquisition discussions. In particular, through the due diligence process for SolarCity's agreed-upon acquisition of Cogenra, Khosla Ventures' investments included several bridge loans to Cogenra. These loans were made on June 27, July 25, and September 2, 2014.

103. The September 2, 2014 bridge loan was made on the same day that SolarCity asked Cogenra for the 90-day exclusivity period and in reliance on SolarCity's representations that the acquisition would close, or at a minimum that SolarCity would conduct due diligence on Cogenra's

proprietary technology in good faith with the goal of completing the acquisition, which caused Cogenra and Khosla Ventures to turn down their other pending offers. Based on the assurances provided by SolarCity to Cogenra and Khosla Ventures that the deal would go through, Khosla Ventures maintained its investment in Cogenra, including by making the bridge loans, and continued to provide Cogenra other resources to support Cogenra in finalizing the acquisition.

**CAUSES OF ACTION**

**<u>COUNT I</u>**

**Misappropriation of Cogenra's Trade Secrets by SolarCity**
**(18 U.S.C. § 1836(b))**

104.    Cogenra realleges and incorporates by reference the allegations in paragraphs 1–103 above.

105.    SolarCity had access to confidential and proprietary information belonging to Cogenra. This information constituted trade secrets belonging to Cogenra under 18 U.S.C. § 1839, in that Cogenra has taken reasonable measures to keep the information a secret and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

106.    SolarCity willfully and maliciously misappropriated Cogenra's trade secrets, thereby gaining economic value from the information. For example, by misappropriating Cogenra's trade secrets, upon information and belief, SolarCity was able to give itself a competitive advantage and head start in developing shingled-cell solar panels. Upon information and belief, SolarCity also used Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property to build a solar module manufacturing factory.

107.    SolarCity misappropriated Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property without Cogenra's consent, and despite SolarCity's duty to maintain the secrecy of the information as set forth in at least the 2014 NDA.

108. As a result of SolarCity's wrongful conduct, upon information and belief, Cogenra has suffered pecuniary losses from (1) disclosure of Cogenra's trade secrets; and (2) upon information and belief, lost revenues and profits.

109. Unless SolarCity's wrongful conduct is restrained and enjoined, Cogenra will suffer further immediate and irreparable injury, for which it has no adequate remedy at law.

<u>COUNT II</u>

**Misappropriation of Cogenra's Trade Secrets by Silevo**
**(18 U.S.C. § 1836(b))**

110. Cogenra realleges and incorporates by reference the allegations in paragraphs 1–109 above.

111. Silevo had access to confidential and proprietary information belonging to Cogenra. This information constituted trade secrets belonging to Cogenra under 18 U.S.C. § 1839, in that Cogenra has taken reasonable measures to keep the information a secret and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

112. Silevo willfully and maliciously misappropriated Cogenra's trade secrets, thereby gaining economic value from the information. For example, by misappropriating Cogenra's confidential and proprietary technology, including its trade secrets, Silevo was able to give itself a competitive advantage and head start in developing shingled-cell solar panels. Upon information and belief, Silevo also filed at least three patent applications on Cogenra's trade secrets, manufacturing processes, and other intellectual property.

113. Silevo misappropriated Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property without Cogenra's consent, and despite Silevo's duty to maintain the secrecy of the information as set forth in at least the 2014 NDA.

114. As a result of Silevo's wrongful conduct, upon information and belief, Cogenra has suffered pecuniary losses from (1) disclosure of Cogenra's trade secrets; and (2) upon information and belief, lost revenues and profits.

115. Unless Silevo's wrongful conduct is restrained and enjoined, Cogenra will suffer further immediate and irreparable injury, for which it has no adequate remedy at law.

## COUNT III

### Misappropriation of Cogenra's Trade Secrets by SolarCity
### (Cal. Civ. Code §§ 3426-3426.11)

116. Cogenra realleges and incorporates by reference the allegations in paragraphs 1–115 above.

117. SolarCity had access to confidential and proprietary information belonging to Cogenra. This information constituted trade secrets belonging to Cogenra under Cal. Civ. Code § 3426.1(d), in that Cogenra derived independent economic value, actual or potential, from the information not being generally known to the public, and Cogenra took reasonable efforts under the circumstances to maintain the secrecy of this information.

118. SolarCity willfully and maliciously misappropriated Cogenra's trade secrets, thereby gaining economic value from the information. For example, by misappropriating Cogenra's trade secrets, upon information and belief, SolarCity was able to give itself a competitive advantage and head start in developing shingled-cell solar panels. Upon information and belief, SolarCity also used Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property in building a solar module manufacturing factory.

119. SolarCity misappropriated Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property without Cogenra's consent, and despite SolarCity's duty to maintain the secrecy of the information as set forth in at least the 2014 NDA.

120. As a result of SolarCity's wrongful conduct, upon information and belief, Cogenra has suffered pecuniary losses from (1) disclosure of Cogenra's trade secrets; and (2) upon information and belief, lost revenues and profits.

121.    Unless SolarCity's wrongful conduct is restrained and enjoined, Cogenra will suffer further immediate and irreparable injury, for which it has no adequate remedy at law.

## COUNT IV

### Misappropriation of Cogenra's Trade Secrets by Silevo
### (Cal. Civ. Code §§ 3426-3426.11)

122.    Cogenra realleges and incorporates by reference the allegations in paragraphs 1–121 above.

123.    Silevo had access to confidential and proprietary information belonging to Cogenra. This information constituted trade secrets belonging to Cogenra under Cal. Civ. Code § 3426.1(d), in that Cogenra derived independent economic value, actual or potential, from the information not being generally known to the public, and Cogenra took reasonable efforts under the circumstances to maintain the secrecy of this information.

124.    Silevo willfully and maliciously misappropriated Cogenra's trade secrets, thereby gaining economic value from the information.  For example, by misappropriating Cogenra's confidential and proprietary technology, including its trade secrets, Silevo was able to give itself a competitive advantage and head start in developing shingled-cell solar panels.  Upon information and belief, Silevo also filed at least three patent applications containing Cogenra's trade secrets, manufacturing processes, and other intellectual property.

125.    Silevo misappropriated Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property without Cogenra's consent, and despite Silevo's duty to maintain the secrecy of the information as set forth in at least the 2014 NDA.

126.    As a result of Silevo's wrongful conduct, upon information and belief, Cogenra has suffered pecuniary losses from (1) disclosure of Cogenra's trade secrets; and (2) upon information and belief, lost revenues and profits.

127.    Unless Silevo's wrongful conduct is restrained and enjoined, Cogenra will suffer further immediate and irreparable injury, for which it has no adequate remedy at law.

## COUNT V

### SolarCity's Intentional Interference With Cogenra's and Khosla Ventures' Prospective Economic Advantage

128.     Cogenra and Khosla Ventures reallege and incorporate by reference the allegations in paragraphs 1–127 above.

129.     Cogenra and Khosla Ventures had economic relationships with third parties with the probability of future economic benefit.  As detailed above, Cogenra and Khosla Ventures received at least three acquisition offers of high value before agreeing to SolarCity's request for a 90-day exclusivity period.

130.     SolarCity was aware of the offers and, on September 2, 2014, SolarCity's COO, Tanguy Serra, explicitly told Cogenra's CEO, Dr. Almogy, not to accept the offers.  Mr. Serra's message was further communicated to Khosla Ventures.  On September 5, 2014, the parties executed a term sheet outlining an acquisition of Cogenra for $155,000,000.

131.     In the absence of SolarCity's offer and insistence on a 90-day exclusivity period, Cogenra and Khosla Ventures would have accepted one of the competing offers for Cogenra.

132.     SolarCity repeatedly assured Cogenra and Khosla Ventures that it would complete its acquisition of Cogenra because SolarCity only offered term sheets for deals that it was certain to complete.  SolarCity represented in words or in substance that its word was its bond.  Prior to sending the term sheet, SolarCity represented in words or substance that it would conduct the remaining due diligence in good faith with the goal of completing the acquisition and consistent with the parties' obligations under the 2014 NDA, and reiterated that SolarCity intended to complete the acquisition.

133.     SolarCity engaged in intentional and independently wrongful misconduct designed to disrupt, and which did disrupt, Cogenra and Khosla Venture's prospective economic relationship with the competing bidders.  Upon information and belief, either at the outset of its acquisition discussions with Cogenra, or, alternatively, at some point prior to terminating its acquisition of Cogenra on October 10, 2014, SolarCity decided that it would not complete the agreed-upon acquisition and that instead it would make and sell its own shingled-cell solar panel.  Rather than immediately terminating the acquisition, SolarCity continued to represent to Cogenra and Khosla

Ventures that it was engaging in good-faith due diligence with a goal of completing the acquisition, when in fact SolarCity was using the due diligence period to gain as much information as possible about Cogenra's proprietary technology, including its trade secrets, manufacturing processes, and other intellectual property. Had SolarCity informed Cogenra and Khosla Ventures that it did not intend to complete the transaction, Cogenra would have never have granted SolarCity access to Cogenra's proprietary technology, or would have restricted such access immediately, and would have instead considered one or more of the competing acquisition offers Cogenra and Khosla Ventures had received. Instead, SolarCity continued to engage in "due diligence" after determining that it had no intention to complete the acquisition, continuing until it had the information it needed from Cogenra to file patent applications to include Cogenra's proprietary shingling technology and to make and sell its own shingled-cell solar panel.

134. Upon information and belief, SolarCity induced Cogenra and Khosla Ventures to provide SolarCity with exclusive access to Cogenra's proprietary technology, including its trade secrets, manufacturing techniques, and other intellectual property, through its false assurances that it intended to acquire Cogenra. Upon information and belief, and in the alternative, prior to delivering a term sheet for the acquisition of Cogenra, SolarCity determined from it and Silevo's initial technical due diligence that SolarCity would file patent applications to include Cogenra's proprietary shingling technology and make and sell its own shingled-cell solar panel using Cogenra's technology. SolarCity did not intend to pursue a good-faith acquisition of Cogenra, but instead delivered a term sheet and insisted on the 90-day exclusivity period in order to gain exclusive access to the full range of Cogenra's proprietary technology. Upon information and belief, only after it completed its "due diligence" of every detail of Cogenra's technology did SolarCity reveal its intent not to pursue an acquisition of Cogenra.

135. As a result of SolarCity's false representations that it would complete the acquisition and conduct good-faith due diligence, Cogenra and Khosla Ventures allowed other acquisition offers to expire. In addition, Khosla Ventures continued its investment in and support of Cogenra, including by making bridge loans totaling over $2 million, and continued to invest other resources in

Cogenra's agreed-upon acquisition by SolarCity. As a result of SolarCity's misconduct, Khosla Ventures and Cogenra have suffered harm and incurred significant damages.

## COUNT VI

### Promissory Estoppel

136. Cogenra and Khosla Ventures reallege and incorporate by reference the allegations in paragraphs 1–135 above.

137. As detailed above, Cogenra and Khosla Ventures received at least three acquisition offers of high value. SolarCity was aware of the offers and, on September 2, 2014, SolarCity's COO, Tanguy Serra, explicitly told Cogenra's CEO, Dr. Almogy, not to accept the offers. Mr. Serra's message was further communicated to Khosla Ventures.

138. SolarCity made a clear and unambiguous promise to Cogenra and Khosla Ventures. As detailed above, between September 3 and September 4, 2014, Samir Kaul of Khosla Ventures met with Mr. Serra on multiple occasions. Mr. Serra assured Mr. Kaul that SolarCity would complete its acquisition of Cogenra. Further, Mr. Serra guaranteed Mr. Kaul that SolarCity only offered term sheets for deals that it intends to complete, and that it intended to acquire Cogenra.

139. On September 5, 2014, the parties executed a term sheet outlining an acquisition of Cogenra for $155,000,000. Separately, SolarCity insisted that Cogenra agree in writing to a 90-day exclusivity period. The term sheet and exclusivity period allowed SolarCity to conduct additional due diligence on Cogenra's proprietary technology.

140. In presenting the term sheet and exclusivity agreement, SolarCity promised, in words or in substance, that it would conduct the remaining due diligence in good faith with the goal of completing the transaction. SolarCity reiterated that it only offered term sheets when it was certain about a deal. SolarCity represented in words or in substance that its word was its bond.

141. SolarCity breached its promise to Cogenra and Khosla Ventures. On October 10, 2014, SolarCity terminated the agreed-upon acquisition of Cogenra. Further, once it gained full access to Cogenra's trade secrets, manufacturing processes, and other intellectual property, SolarCity failed to engage in good-faith due diligence, and instead used the diligence to misappropriate

Cogenra's technology for use in its own patent filings and development of a shingled-cell solar panel.

142.    Cogenra and Khosla Ventures reasonably relied on SolarCity's representations that it would conduct the technical due diligence in good faith with the goal of completing the acquisition. Based on SolarCity's representations, Cogenra and Khosla Ventures allowed other acquisition offers to expire.  In addition, Khosla Ventures continued its investment in and support of Cogenra, including by making bridge loans totaling over $2 million while discussions with SolarCity were pending, and continued to invest other resources in Cogenra's agreed-upon acquisition by SolarCity.

143.    As a result of SolarCity's misconduct, Khosla Ventures and Cogenra have suffered harm and incurred significant damages.

## COUNT VII

### SolarCity's Breach of the 2014 NDA

144.    Cogenra and Khosla Ventures reallege and incorporate by reference the allegations in paragraphs 1–143 above.

145.    On September 11, 2014, SolarCity entered into the 2014 NDA with Cogenra.

146.    The 2014 NDA provides that SolarCity may not use any of Cogenra's confidential information for any purpose other than evaluating and engaging in their common business endeavor. The 2014 NDA protected all confidential information relating to the acquisition, including information that was disclosed prior to the execution of the agreement.

147.    Upon information and belief, SolarCity breached the 2014 NDA by, among other things, using Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing techniques, and other intellectual property to establish a solar module manufacturing factory, as described in detail above.  This manufacturing unit is not a business opportunity in Cogenra's interest.

148.    Upon information and belief, Silevo also breached the 2014 NDA by using Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing techniques, and other intellectual property to design, manufacture, and/or sell shingled-cell solar modules, including but not limited to Silevo's shingled-cell solar panels.

149.     As a result of SolarCity's breach of the 2014 NDA, Cogenra has been damaged in an amount to be proven at trial.

150.     In addition, SolarCity's breach of the 2014 NDA is ongoing and is currently causing Cogenra harm that is irreparable in nature and not readily compensated for in damages.  Moreover, the 2014 NDA states that breaches will cause irreparable injury for which money damages will not provide an adequate remedy.  As such, Cogenra has no adequate remedy at law and is entitled to seek injunctive relief.

## COUNT VIII

### Silevo's Breach of the 2010 NDA and the 2014 NDA

151.     Cogenra and Khosla Ventures reallege and incorporate by reference the allegations in paragraphs 1–150 above.

152.     On October 29, 2010, Silevo, now wholly owned by SolarCity, entered in the 2010 NDA with Cogenra.  Because Silevo was acquired by SolarCity, Silevo was also subject to the 2014 NDA between Cogenra and SolarCity, which protected all confidential information relating to the acquisition, including information that was disclosed prior to the execution of the agreement.

153.     The 2010 NDA provides that Silevo may not use any of Cogenra's confidential information for any purpose other than for the parties' common business endeavors.

154.     The 2014 NDA provides that Silevo may not use any of Cogenra's confidential information for any purpose other than evaluating and engaging in the parties' common business endeavors.

155.     Upon information and belief, Silevo breached the 2010 NDA and the 2014 NDA by, among other things, using Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing techniques, and other intellectual property to prepare and file U.S. Patent Application Nos. 61/751,733, 14/153,608, and 14/563,867, as detailed above.  Such patent applications fall outside the permitted scope of use of the information, as they are not discussions between the parties.

156.    Upon information and belief, Silevo also breached the 2010 NDA and the 2014 NDA by modifying or otherwise using Cogenra's HyperCell shingled module in order to announce its claim of setting a world record for efficiency.

157.    Upon information and belief, Silevo also breached the 2010 NDA and the 2014 NDA by using Cogenra's confidential and proprietary technology, including its trade secrets, manufacturing techniques, and other intellectual property to manufacture shingled-cell solar modules, including but not limited to SolarCity and Silevo's shingled-cell solar panels.

158.    As a result of Silevo's breach of the 2010 NDA and the 2014 NDA, Cogenra has been damaged in an amount to be proven at trial.

159.    In addition, Silevo's breach of the 2010 NDA and the 2014 NDA is ongoing and is currently causing Cogenra harm that is irreparable in nature and not readily compensated for in damages.  Moreover, in Section 7 of the 2010 NDA, Silevo acknowledges that breaches will cause irreparable injury and that there may be no adequate remedy at law.  Similarly, in Section 11 of the 2014 NDA, Silevo acknowledges that breaches will cause irreparable injury for which money damages will not provide an adequate remedy.  As such, Cogenra has no adequate remedy at law and is entitled to seek injunctive relief.

### COUNT IX

**SolarCity's and Silevo's Unfair Business Practices**
**(Cal. Bus. & Prof. Code §§ 17200-17210)**

160.    Cogenra and Khosla Ventures reallege and incorporate by reference the allegations in paragraphs 1–159 above.

161.    The California Unfair Competition Law defines unfair competition to include any "unlawful," "unfair," or "fraudulent" business act or practice.  Cal. Bus. & Prof. Code § 17200.

162.    SolarCity's and Silevo's conduct, as detailed above, constitutes unlawful, unfair, and deceptive acts and practices under California's Unfair Competition Law.

163.    SolarCity and Silevo's misrepresentations about their intentions to acquire Cogenra induced Khosla Ventures to continue supporting and investing in Cogenra with financial and other resources that supported the agreed-upon acquisition.

164.     SolarCity and Silevo misrepresented their intentions to acquire Cogenra in order to gain full access to Cogenra's trade secrets, manufacturing processes, and other intellectual property so that they gained an unfair competitive advantage and head start in their solar module development.

165.     As a result of SolarCity's and Silevo's violation of Cal. Bus. & Prof. Code §§ 17200-17210, Cogenra and Khosla Ventures were damaged and suffered irreparable injury and are, therefore, entitled to restitution and injunctive relief.  Cal. Bus. & Prof. Code § 17203.

## PRAYER FOR RELIEF

WHEREFORE, Cogenra and Khosla Ventures request that the Court enter judgment against SolarCity and Silevo as follows:

a.   finding that SolarCity and Silevo misappropriated one or more of Cogenra's trade secrets, in violation of 18 U.S.C. § 1836(b);

b.   finding that SolarCity and Silevo misappropriated one or more of Cogenra's trade secrets, in violation of Cal. Civ. Code §§ 3426-3426.11;

c.   finding that SolarCity and Silevo intentionally interfered with Cogenra and Khosla Ventures' prospective economic advantage;

d.   finding that SolarCity and Silevo engaged in unfair business practices in violation of Cal. Bus. & Prof. Code §§ 17200-17210;

e.   finding that SolarCity and Silevo breached at least the 2010 NDA and/or the 2014 NDA;

f.   preliminarily and permanently enjoining SolarCity, Silevo, and the companies' respective officers, agents, directors, servants, employees, affiliates, representatives, attorneys, and any others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors and assigns from using any Cogenra confidential and proprietary information and trade secrets it obtained from Cogenra beginning in October 29, 2010 to the present;

g.   preliminarily and permanently enjoining SolarCity from any further prosecution of U.S. Patent Application Nos. 14/510,008; 62/075,134; 14/563,867 (Pub. No. US 2015/0090314 A1); and all related patent applications;

h.  awarding Cogenra and Khosla Ventures compensatory damages for SolarCity's and Silevo's misappropriation of Cogenra's trade secrets, intentional interference with prospective economic advantage, breach of contract, intentional misrepresentations, fraud, and unfair and deceptive business practices;

i.  awarding Cogenra and Khosla Ventures restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by SolarCity and Silevo as a result of their misappropriation of Cogenra's confidential and proprietary technology, including its trade secrets, intentional interference with prospective economic advantage, breach of contract, intentional misrepresentations, fraud, and unfair and deceptive business practices;

j.  awarding Cogenra and Khosla Ventures punitive or statutory damages for SolarCity's fraudulent, willful, and malicious conduct;

k.  awarding costs and interests to Cogenra and Khosla Ventures;

l.  awarding Cogenra and Khosla Ventures attorneys' fees; and

m.  granting such other and future relief as the Court may deem just.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Cogenra and Khosla Ventures demand a jury trial on all issues triable by a jury.


Dated:  June 8, 2017

WILMER CUTLER PICKERING
    HALE & DORR LLP

*/s/ Robert M. Galvin*
Robert M. Galvin
robert.galvin@wilmerhale.com
Anh-Khoa Tran
khoa.tran@wilmerhale.com
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 858-6000
Fax: (650) 858-6100

Robert J. Gunther, Jr.
robert.gunther@wilmerhale.com
Christopher R. Noyes (*pro hac vice*)
christopher.noyes@wilmerhale.com

7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for Plaintiffs*
Cogenra Solar, Inc. and
Khosla Ventures III, L.P.